## WOOD v. UNITED STATES.

## MISENHELTER v. SAME.

District Court, D. Kansas, First Division. November 6, 1928.

Nos. 3237, 3259.

L. E. Goldman and Frank R. Daley, both of Kansas City, Mo., for plaintiffs.

L. E. Wyman, Asst. U. S. Atty., of Topeka, Kan., and J. C. Pappenfort, Regional Atty., U. S. Veterans' Bureau, of Wichita, Kan., for the United States.

McDERMOTT, District Judge. These are two separate cases to recover under war risk insurance policies. Both of the plaintiffs claim to be permanently and totally disabled. Both of them are epileptics; both of them are now permanently and totally disabled within

the meaning of the policy; both of them were afflicted with the disease before their policies lapsed. The only question is whether or not they were totally disabled while their policies were in force. The cases were tried without a jury.

The facts are not seriously in dispute. The plaintiff Roy Wood carried $10,000 of war risk insurance, which lapsed for non-payment of premiums on January 1, 1921. Wood is now in the Soldiers' Home at Leavenworth. While he is an intelligent man, of good physique, he has never done any work since his discharge, excepting that at the Soldiers' Home he picks up laundry of the other residents there for a laundry company, and later distributes the laundry, a task which takes a few hours a week, and for which he gets a mere pittance. His attacks are both of the grand mal and petit mal type, come without warning, and throughout the years have been more or less constant; that is, he sometimes has two or three of the grand mal attacks each month, and sometimes he will go as much as six weeks or two months without any, but has probably averaged one a month. The petit mal attacks are quite frequent, but of less violence. In the grand mal attacks he falls, loses consciousness entirely, the attack itself lasts for a period of from a few minutes to several hours, and are in each instance followed by a much longer period when he is in a stupor. The petit mal attacks cause a momentary loss of control, accompanied by a slight physical tension, and clear up within a period of a few minutes. There has been no evidence of mental or physical deterioration.

The plaintiff Misenhelter was discharged with his outfit, and had had few attacks of consequence prior to his discharge. A mental deterioration showed up first. Before his discharge he was disconnected in his thoughts, moody in his disposition, and peculiar in other ways. He is not naturally of as much intelligence as Wood. He had one or two attacks in the spring of 1920 of some violence. Immediately after his discharge in March of 1920 he took employment with the Fowler Packing Company, and worked there about a month. He then left and went to an army hospital, where he was treated until some time in October. He then returned to his work at the Fowler Packing Company, and worked for two years, but with a week's vacation. He discharged his duties satisfactorily, and quit voluntarily in September of 1922. Since that time the disease progressed rapidly, and in 1926 he was adjudged an incompetent, and he is now a mental wreck, and his epilepsy is very marked.

Epilepsy is not one of the disabilities which are scheduled in the regulations as a total disability. This is correct, for epilepsy, even in the more serious stage known as grand mal, is not in every case a total disability within the meaning of the War Risk Act. There may be many cases where seizures are so infrequent, for example, one in every four or five months, or are so light as to amount to little more than a dizzy spell, where the subject, while inconvenienced, is not in fact totally disabled. Some epileptics have a few minutes warning of an approaching seizure, and can go to a restroom or other place where he can lie down until the spasm has passed, and thus lessen greatly his actual disability to earn a living. On the other hand, there are cases where the seizures occur with such frequency—several times a day —or are of such violence and duration, that total disability is not even open to question. In the Wood case this question is presented: The plaintiff is a young man of excellent physique and much more than ordinary intelligence. In the intervals between his seizures he is quite able to pursue successfully any number of substantially gainful occupations. There is no evidence of any mental or physical deterioration. Probably 90 per cent. of the time, or more, he is a normal, healthy young man. Yet his seizures come without warning, with no regularity, and with such frequency that, as a matter of fact, he cannot find a job, or could not hold it if he found one. The government witnesses frankly state they know of no job he could hold. Manifestly he could not handle an automobile, for he would be a menace to public safety; or a team; or any job involving the use of machinery. Concerns operating under workmen's compensation laws will not generally employ epileptics. This restricts his opportunities, but does not close them. There are still some positions not in these categories; and, if one is able to pursue *any* gainful occupation, there can be no recovery under these policies. Liability does not attach because the insured cannot hold a particular class of employment, or because he cannot do the same work he did before the war. Liability only attaches when he cannot pursue any substantially gainful occupation.

The government urges that Wood is physically and mentally able to hold a position a very large percentage of the time, and that there is no real reason why employers should not employ him. At the same time, it is all too clear that employers will not in fact employ him. It may be superstition, it may be prejudice, it may be illogical, but the truth

still remains that other men wont work with one who is apt to any time go off into an epileptic convulsion. So we are confronted with this situation: An insured, physically and mentally able to hold a job, cannot, because of his epilepsy, find, or ever hope to find, employment. Is there liability?

When the government insured its soldiers and sailors, it was primarily dealing with benefits in case of death. It was a plan to help dependents in case the insured did not return from the Great Adventure. Commercial life insurance companies generally would not carry the risk of a soldier in the trenches or a sailor on the seas. For a very small additional premium the government undertook, in addition, to pay the soldier himself in case he became totally and permanently disabled while his insurance was in force. What did they mean by that? What did the government intend to do when the contract was made? What did the soldier believe he was getting when the premiums were paid?

I am of the belief that when, by reason of physical or mental disability, the insured is compelled to drop out of the ranks of the workers of the world, and stand by the side of the road and watch the world go by, there is liability under the policy. The insured may not be fastidious as to his employment; if, as a matter of fact, he is able to do any honorable work, he is not disabled. But neither is he chargeable with circumstances over which he has no control; and, if employers will not employ epileptics, the soldier is confronted with a condition and not a theory, and he is totally disabled.

Perhaps little can be added to the contract itself. It defines total disability as "any impairment of the mind or body which renders it impossible for the disabled person to follow continuously any substantially gainful occupation." It is a fair definition, and means what it says; but, like all agreements, must be applied to the facts of each particular case. The government accepted for service and insured an illiterate negro, with abnormally low intelligence, one upon whom nature imposed such limitations that common labor must always be his lot. A particular disability would bring him within the definition, while the same injury would be little more than an inconvenience to the soldier who left a professional career to join up with the army. It is always a question of fact, and hard and fast rules hinder, rather than help, their decision. I find that the plaintiff Wood was totally disabled within the meaning of the contract.

The plaintiff Misenhelter stands in different stead. A man of not as much natural intelligence as Wood, like Wood, became afflicted with epilepsy before he left the service. While his policy was in force, his case was not as advanced as that of Wood; his seizures were more infrequent, and not as violent. He gave a history of seizures once every four months. However, the progress of the disease with him was much more rapid. After the fall of 1922, it was accompanied by a pronounced mental disintegration, and since 1926 he has been hopelessly incompetent, and is now a man almost without a mind. His policy lapsed January 1, 1920. He was discharged in March, worked for a month or more, went to a hospital until October, and then returned to work, and held a job at the Fowler Packing Company steadily for more than two years, his only absence being a week off in the summer of 1921. He discharged his duties satisfactorily, and quit the job voluntarily. The record shows no seizures during that period while he was at work. Can it be said he was totally disabled in January, 1920, when he worked continuously for more than two years after that?

It is urged that an insured may be totally disabled, and still do some work. I think that is true. Not long since a case was before me where a soldier, unwilling to give up the fight, took positions repeatedly, held them for a few weeks, and gave them up only when his nerve could carry him no further. He was, in fact totally incapacitated all the time, and a jury promptly and properly found that he should not forfeit his insurance because he fought a losing fight. But is that this case? Nearly three years after his policy lapsed the insured was doing a man's work and doing it well.

It is urged that, when his policy lapsed, he was afflicted with the disease that three years later caused his total disability. That is true; but is it enough? A man carries tubercular germs in his system for years; day by day he loses ground; and one day goes to his bed. When did the total disability occur? Man is mortal, and all of us certainly and surely are marching to the day of total disability, by death or otherwise; but when does the disability occur? The plaintiff presents now a pitiful case, and his widowed and needy mother is entitled to sympathy and compassion in her affliction; and it is with reluctance that I find myself forced to the conclusion that the insured was not totally disabled when he let his insurance lapse. He was then afflicted; one day it was certain to totally disable him; but that day did not arrive for nearly three years.

There is no question of "permanence" in either of the cases. A liberal and generous government has used every effort to cure or better the condition of these men; skilled specialists in every line, in many hospitals, have done their best, and have failed. After eight years it is safe to say that medical skill has played out its string; the men are incurable.

Judgment will be rendered for the plaintiff Roy J. Wood for the payments due from January 1, 1921; an allowance of 10 per cent. attorney fees will be made.

Judgment will be rendered for the defendant in the Misenhelter case.